UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Criminal Action No- 05-100 2 (RWR) |
| ) | |
| DAVID WILSON, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## DETENTION MEMORANDUM

David Wilson was charged along with 14 other defendants in a 73-count indictment with a narcotics conspiracy and related violations. A magistrate judge held a detention hearing and released Wilson into the high intensity supervision program. The government appealed the release order, and following a hearing, this court ordered that Wilson be held without bond pending trial in this case. This detention memorandum is submitted to comply with the statutory obligation that "the judicial officer shall include written findings of fact and a written statement of the reasons for the detention." 18 U.S.C. § 3142(i)(1).

### THE BAIL STATUTE

Under the Bail Reform Act, 18 U.S.C. § 3141, et seq., a person awaiting trial on a federal offense may be released on personal recognizance or bond, conditionally released, or detained. 18 U.S.C. § 3142(a) (2000). A presumption that "no condition or combination of conditions of release will reasonably assure the . . . safety of the community" arises

- 2 -

when "the judicial officer finds that there is probable cause to believe that the person committed an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act." 18 U.S.C. 3142(e).

To rebut the statutory presumption in favor of pretrial detention, a defendant may present evidence that he is not a risk of flight and that he does not pose a danger to the community. In determining whether there are conditions of release that will reasonably assure his appearance as required and the safety of any other person and the community, a court must consider the following factors:

> (1) The nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including
>
>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record' concerning appearance at court proceedings; and
>>
>> . . .
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. §§ 3142(g). A determination of dangerousness must be supported by clear and convincing evidence, United States v.

- 3 -

<u>Alatishe</u>, 768 F.2d 364, 370 (D.C. Cir. 1985), while a
determination of risk of flight must be supported by a
preponderance of the evidence.   <u>United States v. Vortis</u>, 85 F.2d
327, 330 (D.C. Cir. 1986).   Dangerousness includes a danger that
a defendant will engage in illegal narcotics transactions
<u>United States v. Williams</u>, 903 F.2d 844 (D.C. Cir. 1990); <u>United
States v. Thomas</u>, 871 F.2d 1149 (D.C. Cir. 1989); <u>see also</u> <u>United
States v. Brown</u>, 1989 WL 105501 (D.C. Cir. 1989).

<div align="center">DISCUSSION</div>

I.    GOVERNMENT'S EVIDENCE

At the detention hearing before this court, the government
proceeded by a proffer which sought to link the defendant to a
history of drug dealing, two murders, and a recent drug
transaction that occurred while the defendant was in jail.   <u>See
United States v. Smith</u>, 79 F.3d 1208, 1210 (D.C. Cir. 1996)
(allowing government proffer).

A.    <u>Drug dealing from 1991 to 2001</u>

The government proffered evidence from multiple cooperating
witnesses and an informant with first hand knowledge of the drug
conspiracy, and evidence of controlled purchases of drugs from
the defendant and from recorded transactions with defendant.   The
government often offered its assessment of those individuals'
reliability or prior testimony.   Cooperating witness #1 ("CW1"),
who has pled guilty to the drug conspiracy that is the basis of

- 4 -

the indictment in this case, provided information that the
government substantially corroborated.   The government found this
witness to be truthful.   CW1 said that between 1999 and 2000,
Wilson sold ounce quantities of crack cocaine to CW1 six times,
and Wilson bought wholesale amounts of crack cocaine from CW1,
amounting to ten to twenty $10 bags at once.

Cooperating witness #2 ("CW2") also pled guilty to a drug
conspiracy involving these defendants.   CW2's testimony led to
nine individuals pleading guilty and corroborating CW2's
information.   CW2 had personal knowledge that Wilson was involved
in drugs as early as 1991 to 1993.   CW2 supplied Wilson ounce
(28 gram) quantities of crack cocaine twice a week for several
months in 1998.   Between 1999 and 2000, Wilson asked to buy
larger quantities of crack from CW2.   Wilson bought 62 grams of
crack five times, and 125 grams of crack twice, from CW2.
Sometime in 2000 or 2001, the defendant asked CW2 for 500 grams
of crack.

Cooperating witness #3 ("CW3"), a close acquaintance of
Wilson's, pled guilty to the conspiracy charged here and
testified four times for the government.   CW3 was not impeached
on cross-examination, according to the government, and the FBI
corroborated information provided by CW3.   In the late 1990s and
early 2000s, CW3 saw Wilson with 250 grams of crack cocaine and
125 grams of powder numerous times.

- 5 -

Cooperating witness #4 ("CW4"), who also pled guilty to this drug conspiracy, has testified twice in D.C. Superior Court for the government.   CW4 sold cocaine powder to Wilson seven times between 2000 and early 2001 in amounts of 62 or 93 grams.   CW4 also saw Wilson sell an ounce of crack in a 2001 controll d purchase.

Cooperating witness #6 ("CW6") pled guilty to this drug conspiracy and testified twice for the government.   The government said that CW6's testimony was not substantially impeached at trial.   CW6 supplied Wilson with 62 grams of crack cocaine ten times in 1996 and 1997.

Cooperating witness #7 ("CW7") testified twice in this court.   The government averred that the testimony was not substantially impeached, and that significant information CW7 gave was corroborated.   CW7 supplied Wilson with $10 bags, one-eighth ounces, and quarter ounces of cocaine during the mid-1990s.

The government extensively debriefed an informant ("C9"), and C9's information was corroborated at a high level by other cooperators and the FBI investigation.   For approximately five or six months during 2000 to 2001, C9 dealt drugs with Wilson and bought drugs from a supplier for Wilson once a week.   Controlled buys corroborated these allegations.

- 6 -

Wilson distributed crack cocaine during controlled transactions on May 16, May 25, June 28, July 7, and October 17, 2000, and on January 24 and February 14, 2001.  The 2001 sales involved amounts of 10.9 grams and 19.4 grams of crack, respectively.

The government also has electronic evidence of Wilson's drug transactions.  The government recorded Wilson on January 26, 2001 agreeing to distribute ounce quantities of crack cocaine to cooperating witnesses in the future, and on March 20, April 5, and April 26, 2001, distributing crack.

B.   <u>Violence</u>

The government also proffered evidence linking Wilson to the murders of Sam Phillips and Travon Shaw.  CW4, an accomplice, said he drove Wilson to Phillips, lent Wilson a gun, and saw Wilson shoot and kill Phillips on February 6, 2001. An eyewitness description of the shooter fit Wilson's description, but not that of CW4, who is much taller.  A grand jury found probable cause that Wilson committed the murder and Superior Court Judge Natalia Combs Greene found that there was a substantial probability[1] that Wilson committed the murder.

In April 2004, Travon Shaw was shot twice, allegedly by Antwuan Ball, a co-defendant in this case.  Two witnesses

_____

[1] The substantial probability standard is lower than the clear and convincing evidence standard.  <u>Bryan v. United States</u>, 831 A.2d 383, 385-85 (D.C. 2003).

reported hearing a third shot and seeing Wilson walking from Shaw
holding a gun, but no eye witnesses saw Wilson fire the gun at
the victim.   The grand jury found probable cause, and Superior
Court Judge Robert Richter found a substantial probability, that
Wilson shot Travon Shaw.

      C.    <u>D.C. Jail drug transaction on June 5, 2002</u>

     The government proffered new evidence not presented to the
magistrate judge of Wilson's involvement in a drug transaction in
the D.C. Jail.   Three witnesses provided evidence of this event.

     An inmate, who knows Wilson well from before their current
detention in D.C. Jail,  saw someone go to inmate Desmond
Thurston,  a co-defendant in this case, and say that someone in
the hallway wanted Thurston.   The witness identified Wilson as
the man who was waiting for Thurston in the hallway wearing a
kufi and using a mop and bucket.   The witness saw Thurston go to
his cell and then approach an inmate named Gonzales.   Thereafter,
a correctional officer intercepted Gonzales and pried open his
hands.   Wilson then left the area.   The government has debriefed
the inmate witness on a number of occasions and says that he
appears to be credible and that his information has been
corroborated.

     Another witness, the correctional officer ("CO"), gave
information that dovetailed with the inmate witness's account.
The CO saw an inmate wearing a kufi with a mop and a bucket

-8 -

mopping the same space for 25 minutes.   The CO thought it
appeared that he was waiting for something or someone.   At about
1:15 p.m., the CO saw Thurston speak to inmate Gonzales and hand
him something.   Gonzales moved towards the man wearing the kufi
with the mop and bucket.   The CO asked Gonzales what he had in
his hand, and then confiscated what turned out 'to be a zipLock
bag of heroin.   The CO saw the man with the kufi, mop and bucket
leave.   The CO later saw and identified Wilson as that man.W h e n
shown a single photo of Wilson thereafter, the CO confirmed that
Wilson was the man with the kufi, mop and bucket.

The third witness was Gonzales, the middle man in the
attempted drug transaction.   Gonzales provided a description of a
man with a kufi, mop and bucket that matched the other
descriptions, but he could not identify a photo of Wilson,
Gonzales said that Thurston handed him a baggie, and said "'give
this to him," gesturing toward the man with the kufi, mop and
bucket, who was the only person in that area.

II.   DEFENDANT'S REBUTTAL

The defense attempted to rebut the presumption of
dangerousness and show that Wilson could not have been the man
with the kufi, mop and bucket.

A.   Cooperators

The defendant claims that CW2 was impeached at a previous
trial.   However, he has not shown that the impeachment was on any

- 9 -

matter of significance.  The defense also says that CW3's
testimony should not be credited since CW3 testified against
Wilson in a trial at which Wilson was acquitted.  This does not
necessarily undercut the government's information about CW3 since
multiple factors could produce an acquittal.  The defendant
further alleges, without any supporting detail, that CW4 admitted
committing perjury.  Even if the allegation is true, CW4's
information about Wilson's 2001 crack sale was corroborated since
the sale was a government-controlled transaction.

B.    <u>Violence</u>

The defense maintains that the government's evidence
regarding the two murders on the whole does not establish clearly
and convincingly that releasing Wilson would pose a dange  of
violence.   The evidence of Shaw's murder provides no more than a
substantial probability of Wilson's dangerousness.   While the
independent eyewitness description of which person shot Phillips
in 2001 provides more direct evidence of Wilson's dangerousness
than does the evidence, in the Shaw murder, the government has not
presented clear and convincing evidence overall that Wilson's
release would pose a current risk to the community of violence.

C.    <u>D.C. Jail event</u>

The defense introduced a copy of a log from the jail which
reflects that Wilson left the jail's lawyer consultation room at
1:00 p.m. on June 5, 2005.   The defense argues that if the CO is

correct that the man with the kufi mopped for 25 minutes and the heroin interception occurred at 1:15, then that man could not have been Wilson.  Although this evidence is sufficient to undercut the CO's time estimate, it is not enough to undercut the interlocking statements of three eyewitnesses that support the identification of Wilson, or undercut the inference from Wilson's mopping the same space for even 15 minutes that he was waiting for the heroin delivery.'

The defense called as a witness Sgt. James E. Johnson, Jr., the correctional officer in charge of assigning inmates to cleaning details.  Johnson testified that he had not assigned Wilson to any cleaning detail that day.  He added that he was not permitted to assign Wilson to an area off of Wilson's housing unit, such as the hallway where this event occurred.  Johnson admitted that Lt. Holmes, Johnson's superior, was empowered to assign Wilson away from his unit.  Because Holmes moves among inmates while Johnson has a desk job, Holmes could have made such an assignment without Johnson's knowledge of it.  According to Johnson, Holmes has done this in the past.  The government reported, though, that Holmes denied making ad hoc inmate assignments, but has no recollection of June 5, 2005.  While the defense is to be commended for investigating and raising questions about the ability of Wilson to be assigned to or be present at a detail where this transaction occurred, the record

- 11 -

does not show that it would have been impossible for Wilson to get to this hallway on June 5, 2005 and be present there for some time before 1:15 p.m.   The inconsistencies are not enough to undercut the three eyewitnesses whose interlocking statements identify Wilson as the man in the kufi with the mop and bucket.

III. NATURE AND CIRCUMSTANCES OF THE OFFENSES CHARGED

The crimes charged in the indictment are serious narcotic drug crimes, stretching over a time period from 1992 until 2005. All counts of the indictment, except one, trigger the presumption favoring pretrial detention.

IV.   WEIGHT OF THE EVIDENCE AGAINST DEFENDANT

The government's evidence of Wilson's substantial involvement in the narcotics activities with which he is charged is weighty and largely undisputed.   The government has proffered nine cooperating individuals and corroborating electronic evidence.

V.   HISTORY AND CHARACTERISTICS OF DEFENDANT

Wilson does not appear to have any physical or mental impairments.   Throughout the detention hearing, he appeared sufficiently alert and without any apparent health problems.   He has three children, an aunt and a brother in the District of Columbia, according to the Pretrial Services report.   Wilson is unemployed, and has been for some time because he was held

- 12 -

without bond on other charges for many months.   Wilson has been a resident of the District of Columbia for life.

The government has shown Wilson's historical pattern of drug dealing in this community, but no evidence of substance abuse was proffered.   Finally, the defendant has these charges pending against him, but has no prior convictions.

VI.   NATURE AND SERIOUSNESS OF ANY DANGER POSED BY DEFENDANT'S RELEASE

Whether the defendant would pose a danger to the community upon his release is a close case.   It was closer before the government produced the new evidence of the defendant's drug activity in the D.C. Jail:   The recent incident with Thurston augments the historical drug dealing evidence with proof that the defendant has attempted to engage in illegal drug activity as recently as June 5, 2005.   The danger defendant poses to this community is that he would continue to deal drugs.   If locking the defendant up does not stop him from engaging in illegal drug transactions, no combination of conditions would ensure that he would cease to do this if he were released.   The defendant's past physical violence is historic and without more recent information, the government did not show that the defendant is a current danger of physical violence to the community.

CONCLUSION

The defendant has a substantial history of drug dealing and he recently attempted a drug transaction in D.C. Jail.   I find by

clear and convincing evidence that the defendant poses the danger that he will continue to deal drugs upon his release pending trial, and that no combination of release conditions could prevent this. Therefore, pretrial detention is warranted in this case.

SIGNED this 11th day of November, 2005.

/s/
RICHARD W. ROBERTS
United States District Judge